UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| KIM VICULIN,<br><br>Plaintiff,<br><br>v.<br><br>AT&T MOBILITY SERVICES, LLC,<br><br>Defendant.<br>_____/ | Case No. 15-14149<br><br>SENIOR UNITED STATES DISTRICT JUDGE ARTHUR J. TARNOW<br><br>MAGISTRATE JUDGE MICHAEL J. HLUCHANIUK |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21]**

Plaintiff Kim Viculin has extensive experience in the telecommunications industry. He worked for the original AT&T from approximately 1992 until 1997, and Defendant AT&T Mobility Services, LLC[1] between 2004 and 2010, at which point his job was eliminated due to a work-force reduction. Plaintiff began applying for new positions at AT&T starting in 2013. Between 2013 and 2014, he applied for approximately 38 positions and received one interview, but was ultimately not hired.

---

[1] AT&T Mobility Services is the company resulting from the merger of AT&T and SBC Global Services, Inc.

Plaintiff filed this lawsuit on November 25, 2015, alleging age discrimination in violation of the Age Discrimination Employment Act ("ADEA") of 1967, 29 U.S.C. § 621 *et seq.* and the Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2701 *et seq.* Defendant filed its Motion for Summary Judgment [21] on January 30, 2017. The parties timely briefed the motion and the Court heard oral argument on June 5, 2017. Plaintiff and Defendant provided the Court with supplemental briefing [26, 27] on June 19, 2017.

This is a close case. Plaintiff has not met his burden of defeating summary judgment as to his claims for all 38 positions for which he applied. However, questions of material fact remain as to Plaintiff's claims relating to his applications for the Sales Executive 2 Fiber to Building and Sales Executive 1 positions. Specifically, the Court finds that a reasonable jury could determine that Defendant's proffered reasons for failing to hire Plaintiff for these positions are pretext for unlawful age discrimination. Accordingly, Defendant's Motion for Summary Judgment [21] is **GRANTED IN PART and DENIED IN PART**.

## FACTUAL BACKGROUND

Given the nature of Defendant's motion, the Court will present the facts and evidence, and draw all reasonable inferences, in favor of Plaintiff. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012).

62-year old Kim Viculin has a Bachelor's degree in telecommunications from Michigan State University and over 30 years of sales experience, 25 of which are in the telecommunications industry. He worked for the original AT&T in the 1990s. His employment ended in 1997 when he received a Voluntary Retirement Incentive Program ("VRIP")[2] and signed a severance agreement. In September 2004, SBC Global Services, Inc. – which eventually merged with AT&T – hired Viculin. Between 2004 and 2010, Viculin worked as an account manager, an account director, and an account executive. As an account executive, Viculin won multiple new business accounts, generating approximately $5 million in sales. In December 2010, AT&T terminated Viculin's employment as part of a reduction in work force. Viculin received a separation package that included a $17,778.00 payout. Viculin worked in sales for two other companies from January 2011 – July 2011 and from March 2012 – July 2013.

I.    **AT&T's Hiring Process**

External job applicants – individuals not currently working at AT&T – must create an online profile on ATT.jobs. The applicant's profile includes a resume and basic personal information, but does not require the applicant to reveal his date of

---

[2] There is no documentation in the record to affirmatively establish that Viculin was part of a VRIP. At the hearing, Plaintiff's counsel stated that "no party is in possession of the actual VRIP agreement." (Tr. 5:15-16). Plaintiff contends that his tax forms indicate that he was part of a pension plan and received deferred compensation. (Pl.'s Ex. 2).

birth. The profile gives applicants access to Career Path, an internal system that is used to apply for open positions. Internal job applicants – individuals working for AT&T – also use Career Path to apply for open positions. The Talent Acquisition Department works with a Staffing Manager/Recruiter to monitor Taleo, AT&T's internal application tracking system, and fill open positions.

At the "Job Seeker Review" stage, the Staffing Manager evaluates the answers given to pre-screening questions. Generally, there are two types of pre-screening questions: knockout questions and asset questions. Knockout questions allow Staffing Managers to gauge whether an individual meets the basic requirements for the position – whether the applicant has a valid driver's license, for instance. Asset questions, on the other hand, are used to determine whether the candidate meets certain qualifications for the position. There is also a Disqualification section, which, according to Associate Director of Talent Acquisition, Janet Pack,

> is not part of the actual job piece, but . . . the company has to ask these particular questions, and so they are on every person's application. So for instance, you need to be at least 18 years of age to work for AT&T . . . that is definitely one of the questions that would be asked.

(Def.'s Ex. 2, 21:5-11).

One of the questions in the Disqualification section is, "did you leave AT&T under a severance plan?" (Pl.'s Ex. 10). This question, Pack explained, is

>not really a disqualifier, but it is a need to know piece of information. So if someone left on severance . . . if they come back to the company within X period of time, they may owe certain dollars back to the company. Because of course we wouldn't give you severance money and then you come back and you're earning a paycheck at the same time. There is a need to know for the staffing manager, because if we rehire someone with X period of time, we need to work back with the severance team and the benefits group to determine if that individual needs to pay back part of that severance payout.

(Def.'s Ex. 2, 24:9-25).

Other questions in the Disqualification section include: "have you served in the U.S. Military?" and "have you ever been employed by any of the AT&T family of companies or other Bell Companies?" (Pl.'s Ex. 10).

Pack explained that there were no other potential concerns "with respect to an applicant having left the company under a severance plan," and that AT&T

>just reevaluate[s] any external candidate that's a potential rehire based upon their skills to come back to the company for that particular position, and we look to see if they are certainly eligible for rehire or not. There's a rehire database, and it's going to say yes, they're eligible to be rehired or no, they're not eligible to be rehired.

(Def.'s Ex. 2, 25:5-12). Pack reported that Plaintiff was listed as eligible for rehire on the Rehire Database.

Staffing Managers review the applications to establish a pool of the most qualified candidates. In general, internal applicants are considered before external applicants. After finalizing the pool, the Staffing Manager checks the Re-Hire Database to ensure that previously-employed applicants are eligible to be rehired.

Page **5** of **18**

This database contains information about the individual's "dates of employment, the last title the person held, their last compensation, their former supervisor when they left the company and if they were eligible for rehire." *Id.* at 26:7-11.

The Staffing Manager sends a link with the selected applications via Taleo to the department's hiring manager, who reviews the resumes and conducts interviews. Those who make it to second-round interviews meet with the interviewing managers, who decide whether the candidate will receive an employment offer. Staffing managers then proceed with the hiring process for those selected.

## II. Viculin's Job Application History

Viculin began reapplying to work with AT&T in 2013. He applied to 38 job openings and received one interview, but was not hired.

Plaintiff applied for the Sales Executive 2 Fiber to Building and Sales Executive 1 positions in February 2014. The Sales Executive 2 Fiber to Building position entailed generation of new revenue and front-line customer contact. 108 people applied for this position. (Def.'s Ex 6, 6 ¶ 16). Although Viculin had a Bachelor's degree in a technical field,[3] in addition to his many years of experience, when he applied, he was not selected for an interview. AT&T hired 38-year old

---

[3] The parties dispute whether a Bachelor's degree was in fact required or preferred for this position. The Court will discuss this argument more in depth in a later section of the Opinion.

Page **6** of **18**

Tyren Patterson for the Sales Executive 2 position. Patterson does not have a Bachelor's degree and has only 10 years of sales telecommunication experience. Technical Sales Manager Scott Kolarchick, who interviewed Patterson and recommended that he receive an offer of employment, testified that he and Plaintiff had previously worked in close proximity to each other and interacted regularly. (Def.'s Ex. 3, 15:12-20). Kolarchick believed Plaintiff "had a good reputation" within the company. *Id.* at 16:20-22. Kolarchick would have interviewed Plaintiff if he knew that Plaintiff applied for the Sales Executive 2 position. *Id.* at 18:21-24.

Plaintiff and 72 other people applied for the Sales Executive 1 position. (Def.'s Ex 6, 6-7 ¶¶ 20-21). The Staffing Manager selected Plaintiff for the candidate pool and Plaintiff interviewed with Hiring Manager Mark Hughes, who was then 55 years old. Hughes believed that a college degree was "an important part of [the] vetting process." (Def.'s Ex. 4, 31:1-6). Hughes had some concerns about the fact that Plaintiff had previously worked for AT&T "because you never know why people leave." *Id.* at 25:6-8. Hughes ultimately decided to give applicants Aaron Rebeck, Barbara Parker, and Michael Moore second-round interviews. *Id.* at 32:17-21. He believed that these individuals "would best fit the role," despite the fact that Rebeck did not have a Bachelor's degree and both Rebeck and Parker had, like Plaintiff, left AT&T. *Id.* at 32:24-25. Nevertheless,

Rebeck was an attractive candidate because he applied internally and "had a history or a background . . . with a competitor . . . [which] was one of the things that Emily Chin [Assistant Vice President of Connected Communities] and I were looking for." *Id.* at 33:3-7. Hughes felt that Parker, who sought to return to AT&T "to make money again," was "very well qualified to do the role. She did the role successfully in the past." *Id.* at 33:11-14, 35:6-7.

## LEGAL STANDARD

Granting Defendant's Motion for Summary Judgment is appropriate if there is "no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the summary judgment motion, the Court decides "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hawkins v. Anheuser Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## ANALYSIS

Plaintiff brings claims under the federal ADEA and the Michigan ELCRA, both of which prohibit employers from taking adverse action against employees because of age. The Sixth Circuit analyzes these claims using the same standard.

*See Bondurant v. Air Line Pilots Ass'n*, 679 F.3d 386, 394 (6th Cir. 2012). The *McDonell Douglas* burden shifting framework applies because Viculin's age discrimination claims are based on circumstantial evidence. *See Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 704 (6th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To make out a prima facie case of age discrimination, Viculin must show that 1) he was a member of a protected class, 2) he suffered an adverse employment action, 3) he was otherwise qualified for the position, and 4) he was rejected and someone outside the protected class was selected. *Harris v. Metropolitan Gov't of Nashville and Davidson Cnty.*, 594 F.3d 476, 485 (6th Cir. 2010).

### I.  Prima Facie Case

Defendant does not dispute elements 1, 2, and 4 of Plaintiff's prima facie case. The remaining question, then, is whether Plaintiff was otherwise qualified for the Sales Executive 2 Fiber to Building and Sales Executive 1 positions.

At the prima facie stage, the Court focuses on Plaintiff's "objective qualifications to determine whether he . . . is qualified for the relevant job." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir. 2003). Plaintiff can show that he was qualified "by presenting credible evidence that his . . . qualifications

are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 576.

The job descriptions for the Sales Executive 2 Fiber to the Building and Sales Executive 1 positions state, respectively:

> A dedicated Fiber Based Broadband acquisition (hunter) sales executive is needed to proactively support new in region fiber building sales opportunities. Position requires a combination of superior sales, technical, and negotiation skills.
>
> The successful candidate will be responsible for structuring and securing new marketing contracts with owners and developers of apartment, condo and single-family homes within their assigned territory.

(Pl.'s Ex. 10, Ex. 18).

The key roles and responsibilities for these positions included:

- Generating new revenue from customers;
- Sell AT&T enterprise IP and data services to accounts;
- Driving new sales revenue;
- Customer satisfaction;
- Cold-calling prospects to set up meetings and secure new marketing agreements; and
- Maintaining ongoing relationships with internal and external partners to ensure all contractual obligations and targets are being met.

*Id.*

There cannot be a serious dispute as to whether Plaintiff has met his burden of establishing his qualifications for these jobs. He has a Bachelor's in telecommunications from Michigan State University and extensive experience in a

variety of telecommunications jobs. For six years at SBC, Plaintiff was responsible for making contacts and establishing relationships with businesses to sell products and services. He "went out and made phones calls . . . [and] personal visits . . . networked . . . went to meetings . . . whatever [he] needed to do to make contacts to get live accounts to get winbacks." (Def.'s Ex. 1 at 31:2-11). He also sought out new customers to provide "data technologies [and] internet connectivity." *Id.* at 36:14-15. Plaintiff clearly possessed the requisite skills to be successful as a Sales Executive 2 Fiber to Building and/or a Sales Executive 1. Thus, he has established his prima facie case of age discrimination.

## II. Pretext

Now that Plaintiff has established his prima facie case, Defendant must "articulate some legitimate, non-discriminatory reason for its actions." *Skelton v. Sara Lee Corp.*, 249 Fed. Appx. 450, 459 (6th Cir. 2003). Defendant claims that it did not hire Plaintiff because the jobs to which Plaintiff applied were extremely competitive and the individuals who were hired were more qualified and better suited to the position. At this point, under both federal and Michigan law, the presumption of discrimination disappears. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 473 (2001). Plaintiff bears the burden of demonstrating "that the employer's proffered

nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Provenzano*, 663 F.3d at 815; *Lytle v. Malady*, 458 Mich. 153, 176 (1998) (plaintiff "must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful] discrimination.").

Plaintiff can establish that Defendant's reasons for the adverse employment action are pretextual by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009) (citing *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 460 (6th Cir. 2004). To survive summary judgment, "[Plaintiff] must produce sufficient evidence from which a jury could reasonably reject [Defendants'] explanation of why" he was not hired. *Chen*, 580 F.3d at 400 (citing *Mickey v. Zeidler Tool and Die Co*., 516 F.3d 516, 526 (6th Cir. 2008)).

Plaintiff contends that Defendant's justifications for not hiring him are pretextual because neither Patterson nor Rebeck was as qualified as he was for the Sales Executive 2 and 1 positions. The Sixth Circuit has stated:

> Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified

than the successful applicant, *and* the record contains 'other probative evidence of discrimination.'

*Bartlett v. Gates*, 421 Fed. Appx. 485, 490-91 (6th Cir. 2010) (quoting *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627-28 (6th Cir. 2006) (emphasis added)).

Plaintiff has a Bachelor's degree and decades of relevant experience in telecommunications. Neither Patterson nor Rebeck had a Bachelor's degree and both were considerably younger than Plaintiff: Plaintiff was 61-years old when he applied for the positions and both Patterson and Rebeck were in their 30s. Patterson and Rebeck also had experience working at Comcast before transitioning to AT&T.[4]

The Court will deny summary judgment as to Plaintiff's claims relating to his applications for the Sales Executive 2 and 1 positions because there are questions of material fact as to the hiring of Patterson and Rebeck. First, it is unclear whether Defendant required or preferred that the individual filling the Sales Executive 2 position have a college degree. This information is key because it bears on whether Plaintiff offers evidence of superior qualifications and "evidence of irregularities in the application and selection process." *Jenkins v. Nashville Pub. Radio*, 106 Fed. Appx. 991, 995 (6th Cir. 2004). The Sales Executive 2 job requisition states: "Bachelor's Degree, technical discipline

---

[4] Emily Chin, AT&T's Assistant Vice President of Connected Communities, testified that experience at Comcast was not listed as a job qualification or desired skill set for the Sales Executive 1 position.

preferred." (Def.'s Ex. 6 at Pg. ID 600). The prescreening question on the job requisition indicates that "a Bachelor's degree in Engineering, Computer Science, Marketing, Information Technology or Communications" is an asset and is not required. *Id.* at Pg. ID 602. In the Court's view, it seems that Defendant requires a Bachelor's degree for this position, and the preference is for a degree in a technical field. And indeed, Mark Hughes confirmed that a Bachelor's degree was an important part of the vetting process, and Scott Kolarchick (the Hiring Manager for the Sales Executive 2 position) did not have "any reason to disagree that [a Bachelor's degree] was a qualification for that position." (Def.'s Ex. 3, 25:23-25, 26:1-9). If a Bachelor's degree was in fact required for the Sales Executive 2 position, then serious questions exist as to why Patterson – who did not graduate from college – was hired over Plaintiff, especially since Plaintiff had more years of telecommunications experience than Patterson.

Summary judgment must also be denied because there are material questions of fact as to Rebeck's hire. Rebeck, who was 33-years old when he was hired for the Sales Executive 1 position, first worked at AT&T between August 2006 and 2008. He left even though he had heard that it was difficult for individuals who left AT&T to get rehired. (Pl.'s Ex. 17, 10:2-16). Mark Hughes recommended Rebeck for a second-round interview, despite the fact that Rebeck, like Plaintiff, was a

former employee – something that was a concern for Hughes when preparing to interview Plaintiff, but was apparently not an issue when Hughes passed on Rebeck's application. (Def.'s Ex. 4, 25:6-8). Rebeck also lacked a college degree, which Hughes stated was an important part of the vetting process. *Id.* at 31:1-6.

According to Rebeck, his former manager, Richard Allen, "told me when I came back he had to work with HR to get me re-employed." (Pl.'s Ex. 17 at 10:19-20). It was unclear exactly what Allen did, but Rebeck knew that Allen "had to do some extra things to get me back." *Id.* at 10:22-24.

"[W]hile Plaintiff may not have been a 'plainly superior candidate,'" the facts discussed above illustrate that there is a question as to whether Plaintiff was as qualified, if not more qualified, than Patterson and Rebeck, and more importantly, whether age factored into Defendant's decision not to hire Plaintiff. *Bartlett*, 421 Fed. Appx at 491 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394 (6th Cir. 2008)). "[O]ther probative evidence of discrimination" that warrants the denial of summary judgment also exists – namely, the fact that being a former employee was problematic in Plaintiff's case but not Rebeck's; and that Rebeck's manager took extra steps to get him rehired – whereas no one did anything similar for Plaintiff. *Bartlett*, 421 Fed. Appx at 491. These discrepancies

present questions of material fact concerning whether Plaintiff was not hired because of his age.

Defendant argues that Plaintiff cannot establish pretext because it could not have known Plaintiff's age when he applied. The facts in the record regarding Defendant's application and vetting process render this position disingenuous. Janet Pack confirmed that in the event that an applicant indicated that she was either 1) currently on payroll for AT&T or a subsidiary of AT&T, or 2) left AT&T under a severance plan, the Talent Acquisition Department did one of several things. First, Talent Acquisition would either communicate with Human Resources or "go and actually check in a different system" to see if that applicant's benefits would change. (Def.'s Ex. 2, 22:7-14). Alternatively, Talent Acquisition worked "back with the severance team and the benefits group" to check the records to ensure that the applicant would not simultaneously receive a paycheck and severance money. *Id.* at 24:23-25. It was Pack's understanding that the Benefits Team had access to records relating to "when individuals leave the company and then come back." *Id.* at 29:14-17. These interactions could easily allow the Talent Acquisition Department to find an applicant's age and/or date of birth. Further, it belies common sense that Defendant's staffing and hiring managers could not ascertain Plaintiff's age. Specific details on an individual's resume provide hints as

to a person's age; when the applicant graduated from college, for example, or the applicant's years of experience. Moreover, Hughes interviewed Plaintiff and Rebeck in person; although he may not have been able to pinpoint their exact ages, it is difficult to believe that he could not tell the difference in physical appearance between a 33-year old and a 61-year old.

Because "the evidence is such that a reasonable jury could return a verdict for" Plaintiff, a genuine issue for trial exists, and summary judgment will be denied as to Plaintiff's claims relating to the Sales Executive 2 Fiber to Building and Sales Executive 1 positions. *Anderson*, 477 U.S. at 248.

## CONCLUSION

Because questions of fact remain as to whether Defendant's reasons for not hiring Plaintiff for the Sales Executive 2 Fiber to Building and Sales Executive 1 positions were pretext for unlawful discrimination, summary judgment is denied on those claims. Summary judgment is granted as to the remainder of Plaintiff's claims. Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [21] is **GRANTED IN PART and DENIED IN PART**.

**SO ORDERED**.

                                        /s/Arthur J. Tarnow
                                        Arthur J. Tarnow
Dated: July 21, 2017             Senior United States District Judge